1

2

3

4

5

6            IN THE UNITED STATES DISTRICT COURT FOR THE

7                  EASTERN DISTRICT OF CALIFORNIA

8

9  JUVENAL CHAVEZ and VERONICA  )      NO. CV-F-09-2133 OWW/SKO
   CHAVEZ,                       )
10                               )      MEMORANDUM DECISION GRANTING
                                 )      IN PART WITH LEAVE TO AMEND
11                               )      AND DENYING IN PART
                Plaintiffs,      )      DEFENDANTS' MOTION TO
12                               )      DISMISS (Doc. 8)
           vs.                   )
13                               )
                                 )
14 BANK OF AMERICA, N.A.,        )
   PRLAP, INC., et al.,          )
15                               )
                                 )
16              Defendants.      )
                                 )
17 _____)

18      On October 16, 2009, Plaintiffs Juvenal and Veronica Chavez,

19 represented by Chapin Fitzgerald Sullivan LLP (formerly Chapin

20 Wheeler LLP), filed in the Merced County Superior Court a

21 Complaint for Damages and Equitable Relief for (1) fraud, (2)

22 fraud in the inducement, (3) conversion, (4) quiet title, (5)

23 defamation, (6) violation of California Business and Professions

24 Code §§ 17200, and (7) civil conspiracy.  The Complaint also

25 contains a "Petition for Interlocutory Injunctive Relief," which

26 seeks to enjoin foreclosure of the Subject Property.  Defendants

                              1

1    are the Bank of America and PRLAP, Inc., and Does 1-50.   The

2    action was removed to this Court on December 4, 2009.

3         Plaintiffs allege that they own property at 1231 Center

4    Lane, Los Banos, California (the "Subject Property").   Paragraphs

5    19-56 of the Complaint set forth allegations concerning subprime

6    loans and Defendants' alleged participation in that market.

7    Paragraphs 57-77 set forth allegations pertaining to Plaintiffs:

8              57.   The loans at issue were the product of a
               home purchase, through which Plaintiffs were
9              attempting to obtain a safe, affordable
               residential mortgage loan.   Plaintiffs had
10             received advertisement for refinancing from
               Defendant BoA marketing its ability to
11             refinance quickly, purportedly at the best
               interest rates and with the best loan terms.
12             This marketing prompted Plaintiffs to contact
               and speak with a representative of BoA, whose
13             name is Ms. Fong, primarily over the
               telephone.
14
               58.   From the outset of these conversations,
15             Defendants' representative aggressively
               marketed the company's stated-income lending
16             program and made clear to Plaintiffs that
               Defendants required no verification of their
17             financial status to issue a quick approval
               for a refinance.   Defendants' representative
18             reassured Plaintiffs that, even without any
               financial verification, they would obtain a
19             loan package appropriate for their financial
               status, that they would obtain the loan
20             package with the best terms available, and
               that they had no other options.
21
               59.   Defendants' representative submitted a
22             loan application on Plaintiffs' behalf on
               merely a stated-income basis, which
23             Defendants approved.   This approval,
               communicated by BoA's representative, with
24             the full knowledge and consent of its
               trustees, insurers, underwriters, servicers,
25             and assignees, constituted a
               misrepresentation to Plaintiffs that the loan
26             package they obtained was in fact appropriate

                                   2

for their financial condition.

60.  On April 25, 2006, Plaintiffs purchased the Subject Property, through a primary loan they purchased from BoA for $260,000 and a secondary loan, also with BoA, for $32,500, with 100% financing.  Defendants induced Plaintiffs to purchase a hybrid ARM with a piggyback balloon loan, even though Plaintiffs qualified for other loan options that were safer and more reasonable.  This piggyback balloon loan provided for payments that covered only interest during the entire loan term meaning that Plaintiffs could find themselves owing the entire original loan balance at the end of the interest-only period.

61.  As was typical of piggyback balloon loans Defendants sold, the length of Plaintiffs' secondary loan here was fifteen years, shorter than the thirty year term of Plaintiffs' primary loan.  This meant that Plaintiffs' balloon payment, for the entire balance of the secondary loan, would come due while Plaintiffs were still making payments on their primary loan.

62.  Defendants steered Plaintiffs into such a risky loan package in order to increase their own profits, knowing that the loan package provided to Plaintiffs was complicated and deceiving, the actual cost and risk of a default inherent in which Plaintiffs would not understand.

63.  Plaintiffs' primary loan provided for an initial 'teaser' interest rate of 6.375% for a temporary period of five years.  Thereafter, Plaintiffs' yearly interest rate could adjust up to 11.375% with a margin of 2.25% plus prime.

64.  Plaintiffs' secondary loan provided for an interest rate of 8.25% with interest-only payments for ten years, at which time a balloon payment for the total amount of the loan was due.

65.  Defendant PRLAP served as the trustee for the loans BoA originated to Plaintiffs.

3

66.  Defendants offered Plaintiffs only this single lending option.  By offering Plaintiffs only one lending option and then approving, closing on, and servicing these loans, Defendants misrepresented that this loan package, with its particular terms, was the only one available, was appropriate, and was the most effective for Plaintiffs.

67.  Contrary to these representations, Defendants offered Plaintiffs only this risky lending package even though Plaintiffs qualified for other lending options that were safer and more reasonable.  Defendants bundled this package with additional risky features that made it ever riskier, including illusory interest rates, a high LTV ratio, loan qualification based on a 'teaser' interest rate, and illusory underwriting procedures.  These features all worked together to guarantee Plaintiffs' eventual default and foreclosure.

68.  Defendants' representative misrepresented to Plaintiffs that the loans' rate structure was extremely cheap and low-risk, focusing on the temporary, fixed 'teaser' rate period and falsely stating that the adjustable interest rate structure was not relevant to what Plaintiffs would later have to pay.  Defendants made this representation despite their awareness that this adjustable rate structure would cause Plaintiffs' monthly payment amount to increase sharply, setting Plaintiffs up for default and foreclosure.  Defendants did this to induce Plaintiffs into purchasing the loans for Defendants' own immediate profit.

69.  None of Defendants ever provided Plaintiffs with any disclosures or estimates prior to closing.  In addition, no one ever explained to them the inherent risks of an Option ARM loan coupled with an initial 'teaser' interest rate, interest-only payments, and a piggyback balloon loan, especially the devastating effect of negative amortization.

70.  When entered into loan agreements with Plaintiffs, Defendants, by and through their

representatives, employees, fiduciaries, and agents, again failed to disclose and knowingly misrepresented key terms of the loans sold to Plaintiffs, including the risks inherent in a Hybrid ARM coupled with an initial 'teaser' interest rate, interest-only payments, and a piggyback balloon loan.  At closing, Defendants simply told Plaintiffs to sign without any explanation, brief or otherwise, as to the terms and risks of such a loan package.

71.  Defendants disregarded and ignored Plaintiffs' actual ability to pay off the loans they sold by failing to conduct meaningful underwriting.  Plaintiffs did not realize or understand that they were being sold a loan package that they could not afford and were not qualified to receive until they were facing default and foreclosure.

72.  Defendants also grossly inflated the value of the Subject Property in order to give Plaintiffs the false impression that they had substantial equity above and beyond the loan amounts.  Defendants never provided Plaintiffs with documentation supporting their valuation.

73.  When Plaintiffs expressed any apprehension about their ability to afford the loans long-term, Defendants misrepresented to Plaintiffs their ability to afford the loans, should the terms later become unaffordable.  Defendants told Plaintiffs, throughout the loan application and approval process, that their purported equity in the property would allow then to refinance with a lower interest rate and at a principal amount lower than the property's market value.  Defendants also assured Plaintiffs that the Subject Property's value would continue to rise, and that Defendants would approve any subsequent refinance request due to the inevitable and perpetual rise of Plaintiffs' property value.

74.  Defendants knew or should have known that Plaintiffs' loans would likely result in default and foreclosure, particularly in

5

light of their qualifying Plaintiffs in reliance on a false promise of serial refinancing, which in turn relied on a false promise of perpetual property price appreciation. In conjunction with their employees, agents, sale representatives, and mortgage brokers, Defendants failed to meaningfully account for payment adjustments in approving and selling Plaintiffs' loans, thereby failing to meaningfully account for Plaintiffs' ability to repay the loans long-term. This illusory underwriting inevitably led to Plaintiffs' defaulting on their loans.

75. Defendants, along with their employees, agents, brokers, appraisers, and co-defendants, sold these loans to Plaintiffs with the intent and design to fraudulently maximize profits. Defendants, along with their employees, agents, brokers, appraisers, and co-defendants, induced Plaintiffs to accept this risky loan package with misleading and false statements and by withholding material information as to the loans' true costs and risks. For their role, Defendants rewarded their agents and brokers with excessive commissions and passed this compensation on to Plaintiffs in the form of increased origination fees, higher interest rates, and credit spreads above the index value of their loans.

76. These activities of Defendants combined to inflate the value of the Subject Property, further increasing Defendants' revenues at the severe expense of Plaintiffs' financial health. Because of the high LTV ratio on the loans Defendants sold and the characteristics of Plaintiffs' loan package, Plaintiffs were acutely susceptible to being turned 'upside down' on their mortgage and incurring substantial negative equity in their property, which is precisely what occurred as soon as the real estate market flattened. Plaintiffs are now faced with monthly payments that they cannot afford, and are unable to refinance the Subject Property.

77. Defendants, and each of them, acted with full knowledge of the terms of Plaintiffs' loans and that these terms were inappropriate

6

given the Subject Property's actual value and
Plaintiffs' actual financial qualifications.
In particular, Defendants, and each of them,
acted with full knowledge as to how
misleading, deceptive, and unduly risky such
loan packages were, particularly when sold on
a stated-income basis with only illusory
underwriting procedures.  Defendants where
[sic] therefore fully aware that Plaintiffs
were likely to become trapped in a loan for
which they were not appropriately qualified
and would certainly become unaffordable once
the 'teaser' period reset.  Most importantly
for Defendants, they had full knowledge of
the opportunities available to them on the
securities market, where the transfer and
dispersal of risk meant that profits derived
from indiscriminate volume and costly loan
terms [sic].

Defendants move to dismiss the Complaint for failure to

state a claim upon which relief can be granted.  Defendants did

not file a reply brief.  The parties submitted the motion for

resolution on the papers without oral argument.

A.   GOVERNING STANDARDS.

A motion to dismiss under Rule 12(b)(6) tests the

sufficiency of the complaint.  *Novarro v. Black*, 250 F.3d 729,

732 (9th Cir.2001).  Dismissal is warranted under Rule 12(b)(6)

where the complaint lacks a cognizable legal theory or where the

complaint presents a cognizable legal theory yet fails to plead

essential facts under that theory.  *Robertson v. Dean Witter*

*Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984).  In reviewing a

motion to dismiss under Rule 12(b)(6), the court must assume the

truth of all factual allegations and must construe all inferences

from them in the light most favorable to the nonmoving party.

*Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002).  However,

legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003). "A district court should grant a motion to dismiss if plaintiffs have not pled 'enough facts to state a claim to relief that is plausible on its face.'" *Williams ex rel. Tabiu v. Gerber Products Co.,* 523 F.3d 934, 938 (9th Cir.2008), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "'Factual allegations must be enough to raise a right to relief above the speculative level.'" *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, *id.* at 555. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully, *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557. In *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937 (2009), the Supreme Court explained:

Two working principles underlie our decision

in *Twombly.*  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitations of the elements of a cause of action, supported by mere conclusory statements, do not suffice ... Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss ... Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense ... But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.' ....

In keeping with these principles, a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Immunities and other affirmative defenses may be upheld on a motion to dismiss only when they are established on the face of the complaint.  *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980)  When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the

9

complaint when authenticity is not contested, and matters of which the court takes judicial notice.  *Parrino v. FHP, Inc*, 146 F.3d 699, 705-706 (9th Cir.1988).

     **B.   <u>FIRST CAUSE OF ACTION FOR FRAUD AND SECOND CAUSE OF ACTION FOR FRAUD IN THE INDUCEMENT</u>.**

     The First and Second Causes of Action for fraud and fraud in the inducement allege:

> 79.  As set forth herein, Defendants misrepresented and concealed from Plaintiffs, via advertisements, conduct, and affirmative statements, key facts related to the loans here at issue.  When Defendants made these misrepresentations to Plaintiffs, Defendants made them without regard for the truth, with knowledge of their falsity, and deceptive nature, and with the intent that Plaintiffs would rely on these misrepresentations and, as a product of this reliance, sign loan documents and secure the Subject Property for said loans.

> 80.  Each defendant, by and through its agents and representatives, engaged in these misrepresentations and/or concealments and profited from this deception.  Defendants, and all of them, acted in concert, participated in, had full knowledge of, and wrongfully benefitted from the fraudulent acts described in this Complaint.

> 81.  Specifically, Defendants fraudulently induced Plaintiffs to accept Defendants' risky loan products by (1) failing to clearly and conspicuously disclose the risks and eventual 'payment shock' inherent in a Hybrid ARM that provided an initial 'teaser' interest rate and interest-only payments coupled with a piggyback balloon loan; (2) failing to clearly and conspicuously disclose whether Plaintiffs' stated monthly payments included amounts due for insurance and taxes, which they generally did not; (3) failing to clearly and conspicuously disclose closing costs and fees; (4) making false promises

10

that Defendants would refinance the loan
prior to a rate increase; (5) failing to
disclose the true costs and risks associated
with the false promise that refinancing would
be available as an exit strategy when
Plaintiffs' loans became unaffordable; (6)
fraudulently promising that the value of the
Subject Property would increase and,
therefore, that Plaintiffs could easily
refinance; (7) steering Plaintiffs away form
safer, fixed interest rate prime loans that
they could afford and instead toward a Hybrid
ARM providing for an initial 'teaser'
interest rate and interest-only payments,
coupled with a piggyback balloon loan that
was based on an inflated loan amount; (8)
false marketing acts designed to mask the
true costs and risks of Plaintiffs' loans and
to hide the benefits of other, safer loan
products, and (9) inducing Plaintiffs to
accept an adjustable, teaser interest rate
loan, coupled with interred-only payments and
a piggyback loan, with the false promise of a
lower interest rate.

82.   Defendants represented to Plaintiffs
that all the statements made to them during
the origination and underwriting of the loans
at issue, including those concerning the
purported value of the property supporting
the loans, were true, and Defendants did so
while concealing their mortgage lending
scheme from Plaintiffs.

83.   These misrepresentations, deceptions,
false promises, and concealments of material
information occurred during the loan
application process, the underwriting
process, at the time of the loans' subsequent
approval, at the loans' closing, and even
post-closing.   These misrepresentations and
concealments in fact continue, as Defendants
insist on collecting on the loans and
pursuing their purported interest in the
Subject Property based on loans that
Defendants know were and continue to be
fraudulent.

84.   Plaintiffs justifiably relied on
Defendants' statements as true and complete
because Defendants purported to be duly

11

licensed professionals and corporations
authorized to broker, issue, process, and
purchase residential mortgage loans, subject
to and purportedly following the laws and
regulations particular to their practice of
engaging consumers in mortgage lending.
Defendants had resources, knowledge, and
expertise in mortgage lending far surpassing
that of Plaintiffs and, moreover, Defendants
represented themselves, their employees, and
their agents to be experts in the field.

85.   Defendants, and all of them, knew of and
participated in this system of fraud, acting
in concert to communicate their
misrepresentations to Plaintiffs via conduct,
lack of disclosure, and false statements.
Defendants effectuated this fraud via a
system obsessed with their own profit,
rewarding agents, brokers, and fiduciaries
that produced the highest volume of loans
with the most costly terms as to borrowers,
while turning a blind eye to reckless and
desceptive misconduct via their illusory
underwriting procedures.   The secondary
mortgage market enabled and incentivized this
systemized fraud by enabling Defendants o she
the risk of the loans at issue and maximize
their own short terms gain, all at
Plaintiffs' expense.   Without Defendants
working together, such a fraud would have
been neither possible nor profitable.

Defendants move to dismiss these causes of action on the grounds that they are barred by the statute of limitations and the Complaint does not allege any fraudulent conduct with the required particularity.

1.   <u>Statute of Limitations</u>.

Defendants move to dismiss these causes of action as barred by the three year statute of limitations in California Code of

12

Civil Procedure § 338(d):[1]

> Within three years:
> ...
>
> (d) An action for relief on the ground of
> fraud or mistake.  The cause of action in
> that case is not deemed to have accrued until
> the discovery, by the aggrieved party, of the
> facts constituting the fraud or mistake.

Defendants note that the loans were originated on April 25, 2006 and that this action was not filed until October 16, 2009, more than three years later.

Plaintiffs respond that dismissal on this ground is not appropriate because Plaintiffs were not aware of Defendants' allegedly fraudulent conduct until on or about September of 2009.

As explained in *Neveu v. City of Fresno*, 392 F.Supp.2d 1159, 1169 (E.D.Cal.2005):

> 'Where the facts and dates alleged in a
> complaint demonstrate that the complaint
> is barred by the statute of limitations, a
> Federal Rule of Civil Procedure 12(b)(6)
> motion should be granted.' ... There is no
> requirement, however, that affirmative
> defenses, including statutes of limitation,
> appear on the face of the complaint ... 'When
> a motion to dismiss is based on the running
> of the statute of limitations, it can be
> granted only if the assertions of the
> complaint, read with the required liberality,
> would not permit the plaintiff to prove that
> the statute was tolled.'

Defendants' motion to dismiss the First and Second Causes of Action as barred by the statute of limitations is DENIED because

---

[1]Defendants' brief refers to Section 338(j), which provides for a three year statute of limitations for "[a]n action to recover for physical damage to private property under Section 19 of Article I of the California Constitution."

the allegations present factual issues to be resolved at summary judgment or trial.

### 2.   Particularity.

Defendants move to dismiss these causes of action on the ground that the alleged fraud is not pleaded with the particularity required by Rule 9(b), Federal Rules of Civil Procedure.

Rule 9(b) requires that, in all averments of fraud, the circumstances constituting fraud be stated with particularity. One of the purposes behind Rule 9(b)'s heightened pleading requirement is to put defendants on notice of the specific fraudulent conduct in order to enable them to adequately defend against such allegations. *See In re Stac Elec. Litig.*, 89 F.3d 1399, 1405 (9th Cir.1996). Furthermore, Rule 9(b) serves "to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *Id.*

Rule 9(b) requires that allegations of fraud be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong. *Celado Int'l., Ltd. v. Walt Disney Co.*, 347 F.Supp.2d 846, 855 (C.D.Cal.2004); *see also Neubronner v. Milkin*,

6 F.3d 666, 671 (9th Cir.1993).  As a general rule, fraud allegations must state "the time, place and specific content of the false representations as well as the identities of the parties to the misrepresentation."  *Schreiber Distrib. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir.1986).  As explained in *Neubronner v. Milken*, *supra*, 6 F.3d at 672:

> This court has held that the general rule that allegations of fraud based on information and belief do not satisfy Rule 9(b) may be relaxed with respect to matters within the opposing party's knowledge.  In such situations, plaintiffs cannot be expected to have personal knowledge of the relevant facts ... However, this exception does not nullify Rule 9(b); a plaintiff who makes allegations on information and belief must state the factual basis for the belief.

Defendants assert that Plaintiffs' fraud allegations lack any of the "who, what, when, where, and how" required for pleading fraud and that the Complaint "simply sets forth allegations that appear, often verbatim, in countless other complaints involving different borrowers and different lenders." Defendants contend that, other than the allegations in Paragraphs 57-77 quoted above:

> The remaining allegations are mere filler that appear in every complaint that Chapin Wheeler [sic] has filed against mortgage lenders in California this year, including the following: *Diaz v. America's Servicing Co., et al.,* (Super.Ct. Santa Clara Co., 2009, No. 109-CV-155020); *Lim v. HSBC Mortgage Corp, (USA), et al.* (Super.Ct.San Joaquin Co., 2009 39-2009-00215519-CU-OR-STK); *Nguyen v. Wells Fargo Bank, N.A., et al.* (Super.Ct. Santa Clara Co., 2009, No. 199-CV-144605); *Parent v. Bank of America, N.A., et al.* (Super.Ct. Santa Clara Co.,

15

2009, No. 109-CV-143479); *Va v. Wells Fargo Bank* (Super.Ct. Santa Clara Co., 2009 No. 109-CV-143478).

Defendants do not request the Court take judicial notice of the Complaints filed in these other listed actions and do not provide copies of these Complaints.  Plaintiffs, citing *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal.4th 553, 577 n.13), that "'"[m]atters otherwise subject to judicial notice must be relevant to an issue in the action,"'" argue that Defendants should not be allowed to request judicial notice of these Complaints:

> Defendants cannot show that the other complaints are relevant to the present action.  Defendants have failed to explicitly assert or prove that the facts, circumstances, or legal issues in the present case are similar to the facts, circumstances, or legal issues presented in other complaint [sic].  Indeed, Defendants' action in referencing other complaints that have no bearing to this case is a deliberate distortion of the facts, is highly and improperly prejudicial to Plaintiffs' case, and should not be permitted.  Contrary to the Defendants' implicit allegation of similarity, this case is distinguishable in numerous regards, including the facts, loans at issue, and parties from other complaints.  Indeed, it is readily apparent that there is no co-relation between the other complaints and the present action, other than loans being made by lenders on a broad level.

Rule 201, Federal Rules of Evidence, provides:

> (b) Kinds of facts.  A judicially noticed fact must be one not in dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

> (c) When discretionary.  A court may take

16

1          judicial notice, whether requested or not.

2          (d) When mandatory.  A court shall take
           judicial notice if requested by a party and
3          supplied with the necessary information.

4          (e) Opportunity to be heard.  A party is
           entitled upon timely request to an
5          opportunity to be heard as to the propriety
           of taking judicial notice and the tenor of
6          the matter noticed.  In the absence of prior
           notification, the request may be made after
7          judicial notice has been taken.

8  The Court may take judicial notice of matters of public record,

9  including duly recorded documents, and court records available to

10 the public through the PACER system via the internet.  *See* Fed.

11 R. Evid. Rule 201(b); *United States v. Howard*, 381 F.3d 873, 876,

12 fn.1 (9th Cir. 2004).

13       Because the Court is not provided copies of the Complaints

14 in the described actions, Defendants' assertions concerning them

15 are unverifiable.  If these Complaints contain allegations

16 similar to those in this action, that does not, *ipso facto*,

17 establish that Plaintiffs have not pleaded fraud in this action

18 with the specificity required by Rule 9(b).

19       Plaintiffs argue that the Complaint sufficiently alleges

20 fraud pursuant to the Rule 9(b) standards.

21       Plaintiffs have not satisfied Rule 9(b).  Other than Ms.

22 Fong, no one associated with Defendants is named and the alleged

23 misrepresentations are very generically described as are the

24 times when the misrepresentations were made, i.e., at every stage

25 of the loan process and thereafter.  As an example, it is alleged

26 that Defendants *promised* that the value of the Subject Property

17

1 would increase and that Plaintiffs could then refinance; who made

2 this promise and when.  Plaintiffs allege that Defendants

3 inflated the value of the Subject Property; who did so and when

4 (and do Plaintiffs mean that the market value was incorrectly

5 stated at the time of the appraisal or are they stating that the

6 market value subsequently fell and Defendants should have

7 anticipated that).

8    Defendants' motion to dismiss the First and Second Causes of

9 Action is GRANTED WITH LEAVE TO AMEND to specifically allege

10 fraud and fraud in the inducement in compliance with Rule 9(b).

11    C.   **THIRD CAUSE OF ACTION FOR CONVERSION**.

12    The Third Cause of Action, after incorporating all preceding

13 allegations, alleges:

14    89.  As set forth herein, Defendants induced
       Plaintiffs to accept the unduly risky loans
15     at issue in this case through fraud, deceit,
       and unfair business practices, in violation
16     of California law.  Defendants also set the
       interest rate on Plaintiffs' loans unjustly
17     high and artificially inflated the value of
       the Subject Property so as to fraudulently
18     justify larger loans, increasing Plaintiffs'
       monthly mortgage payments in the process.
19
       90.  By increasing Plaintiffs' monthly
20     mortgage payments, Defendants extracted from
       Plaintiffs more money than they legitimately
21     should have paid.  Further, as Defendants'
       own policies require, any payments Plaintiffs
22     made in excess of the amount they owed should
       have been applied directly to the loans'
23     principal.  Defendants violated California
       law, and their own policies, by applying the
24     excess amount of Plaintiffs' monthly payments
       to interest that they did not legitimately
25     owe and improperly converting said funds to
       Defendants' own use and benefit.

26

91.   Defendants knew that Plaintiffs' loans
posed a very high risk of default, and
Defendants mitigated this risk for themselves
by simply calculating uncollected interest on
Plaintiffs' loans as additional principal.
In so doing, Defendants violated California
law, as well as their own policies, by
applying a portion of Plaintiffs' monthly
payments to interest that Plaintiffs did not
legitimately owe, improperly converting said
funds for their own use and benefit.

97.   Defendants' conversion has caused
Plaintiffs to suffer severe financial
hardship resulting in damages to be proved at
trial.

Defendants move to dismiss the Third Cause of Action.

Defendants cite *McKell v. Washington Mutual, Inc.*, 147

Cal.App.4th 1457 (2006).   In *McKell*, home mortgagors brought a

class action against the lender, alleging various causes of

action, including conversion, in connection with alleged

overcharging of underwriting, tax services, and wire transfer

fees in connection with their home loans.   The Court of Appeal

ruled:

A cause of action for conversion requires
allegations of plaintiff's ownership or right
to possession of property; defendant's
wrongful act toward or disposition of the
property, interfering with plaintiff's
possession; and damage to plaintiff ... Money
cannot be the subject of a cause of action
for conversion unless there is a specific,
identifiable sum involved, such as where an
agent accepts a sum of money to be paid to
another and fails to make the payment ...
Thus, in *Chavez v. Centennial Bank* (1998) 61
Cal.App.4th 532, 542 ..., the plaintiffs
stated a cause of action for conversion where
the bank took funds from trust accounts to
pay the trustee's personal indebtedness.

Here .... plaintiffs did not allege that

19

> defendants were holding their payments on
> behalf of another, in essence in trust for
> the third party vendors.  Plaintiffs cite no
> authority for the proposition that a cause of
> action for conversion may be based on an
> overcharge.  Consequently, they have failed
> to demonstrate that they have stated a cause
> of action for conversion.

Defendants assert that Plaintiffs owed their loan payments to

Bank of America and lost title to the payments when they were

made and cannot recover their loan payments because they no

longer have title to the money.

Plaintiffs respond that California Courts recognize that

"[m]oney can be the subject of an action for conversion if a

specific sum capable of identification is involved." *Farmers

Ins. Exchange v. Zerin*, 53 Cal.App.4th 445, 452 (1997).

Plaintiff also cite *McCaffey Canning Co. v. Bank of America*, 109

Cal.App. 415, 424 (1930), that "[a]n unjustified claim of title

may amount to conversion."   Plaintiffs argue:

> Plaintiffs specifically plead that they are
> the owners of the [Subject Property] ...
> Plaintiffs also state that, 'by increasing
> Plaintiffs' monthly payments, Defendants
> extracted from Plaintiffs more money than
> they legitimately should have paid.' ...
> Because of Defendants' conduct, Plaintiffs
> have a right to the monies that were
> unlawfully converted as payments to
> Defendants.  Each time Plaintiffs rendered
> payments under the loans, Defendants took
> such inflated payments under their control
> for their own profit.  Plaintiffs argue that
> the initial rate and principal on the loans
> were inflated and did not correlate with
> Plaintiffs' income.  BOA is liable for
> conversion because it is the originator and
> servicer of both the primary and secondary
> loans if a more specific amount of conversion
> is warranted then Plaintiff [sic] should be

1
2
3

> allow [sic] to amend the complaint.
> Moreover, BOA continues to demand payments
> from the Plaintiffs pursuant to the unlawful
> loans.  PRLAP is named as trustee of the
> subject loans.

4    In *Zerin*, Farmers Insurance Exchange sued an attorney for

5  reimbursement of money received from third-party tortfeasors on

6  behalf of defendant clients injured in automobile accidents

7  involving plaintiff's insureds, who had been paid medical

8  benefits by plaintiff, pursuant to a policy provision stating:

9  "When a person has been paid damages by us under this policy and

10  also recovers from another, the amount recovered from the other

11  shall be held by that person in trust for us and reimbursed to us

12  to the extent of our payment."  The trial court sustained a

13  demurrer to the cause of action for conversion.  The Court of

14  Appeals ruled:

15
16
17
18
19
20
21
22

> 'Conversion is the wrongful exercise of
> dominion over the property of another.  The
> elements of a conversion are the plaintiff's
> ownership or right to possession of the
> property at the time of the conversion; the
> defendant's conversion by a wrongful act or
> disposition of property rights; and damages.
> It is not necessary that there be a manual
> taking of the property; it is only necessary
> to show an assumption of control or ownership
> over the property or that the alleged
> converter has applied the property to his own
> use ...' ... Money can be the subject of an
> action for conversion if a specific sum
> capable of identification is involved ....

23
24
25
26

> Neither legal title nor absolute ownership of
> the property is necessary ... A party need
> only allege it is 'entitled to immediate
> possession at the time of conversion ...' ...
> However, a mere contractual right of payment,
> without more, will not suffice ....

53 Cal.App.4th at 451-452.  The Court of Appeals rejected Farmers' contention that it had a sufficient property interest in the third party recoveries by virtue of the policy language which, it argued, created an actual or equitable lien on the funds and sustained the demurrer to the conversion causes of action.  *Id.* at 452-457.

In *McCaffey*, the plaintiff had brought an action in which it obtained a judgment and had caused a writ of attachment to issue to the sheriff to attach certain enumerated canned goods in the judgment debtor's possession.  The sheriff took custody of the canned goods pursuant to the writ.  Thereafter, the Bank of America made a third-party claim to certain of the canned goods, averring that it had a security interest in those goods.  Upon receipt of the bank's claim the sheriff notified plaintiff.  The plaintiff refused to furnish an indemnity bond to the sheriff on the ground that the bank's claim was legally insufficient and that there had been no change of possession required by law for consummation of a pledge.  The sheriff released from his custody all of the canned goods, including those subject to the writ of attachment.  The canned goods were subsequently sold by the bank for its own account, the entire proceeds being applied toward satisfaction of its loans.  The Court of Appeals held that "unless the Bank of America was in fact legally justified in claiming as a pledgee, the plaintiff should be entitled to recover in conversion for the nullification of its attachment lien."  *Id.* at 426.

22

In *Kelley v. Mortgage Electronic Registration Systems, Inc.,* 642 F.Supp.2d 1048, 1057 (N.D.Cal.2009), the District Court held:

> Here, the alleged conversion is that defendants 'established an unwarranted high monthly payment by artificially inflating the value of the property to fraudulently justify a larger mortgage.' ... This is not a conversion because it does not constitute an exercise of dominion by defendants over plaintiffs' property.  Plaintiffs have not alleged any of the elements of a conversion.

In *Montoya v. Countrywide Bank*, 2009 WL 1813973 at *8-9 (N.D.Cal., June 25, 2009), the District Court addressed a motion to dismiss a claim for conversion:

> In this case, Plaintiffs allege as follows:
> Defendants ... entered a conspiracy to induce the Plaintiffs to agree to the [residential mortgage loan] through fraud, deceit, and unfair business practices ... Defendant Countrywide, at the direction of all Defendants as part of this conspiracy, set an unjustly high monthly payment by artificially inflating the value of the property to fraudulently justify a larger mortgage.
>
> By raising the monthly payment rate, Defendants extracted from the Plaintiffs Montoya [sic] a higher amount than the Plaintiffs legitimately should have paid ... [A]s required by Defendant Countrywide's own policies, any payments made in excess of the amount owed should [have been] applied directly to the principle of the account.  Defendant Countrywide violated the RML contract and their own policies by applying the extra payments to interest that was not legitimately owed by the Plaintiff.  The Defendants as part of their

23

1              conspiracy, improperly converted
              said funds of Plaintiffs Montoya
2              for their own use.

3          ... Plaintiffs' conversion allegations fails
              to allege facts that make it plausible that
4              Defendants exercised dominion and control
              over Plaintiffs' personal property in manner
5              [sic] that was inconsistent with Plaintiffs'
              rights at the time.  Plaintiffs' claim is
6              premised on a fraudulently obtained loan by
              Defendants.  However, as discussed above,
7              Plaintiffs have not adequately alleged any
              causes of action sounding in fraud.  Further,
8              the allegations of the Complaint make it
              clear that Plaintiffs entered into multiple
9              loans that required interest-only payments to
              Defendants for the first ten years ... Based
10             on these allegations, Defendants' acceptance
              of Plaintiffs' monthly payments could not
11             plausibly be deemed wrongful.  Thus, the
              Court finds Plaintiffs have not adequately
12             alleged a claim for conversion.

13      In *Somsanith v. Bank of America,* 2009 WL 3755593 at *4

14 (E.D.Cal., Nov. 6, 2009), the District Court ruled:

15          [P]laintiff's conversion allegations fail to
              allege facts that make it plausible that Bank
16             of America exercised dominion over
              plaintiff's personal property in manner [sic]
17             that was inconsistent with plaintiff's rights
              at the time.  Plaintiff's claim is premised
18             on a fraudulently obtained loan by defendants
              ... While plaintiff does allege that Bank of
19             America 'set an unjustly high monthly payment
              by artificially inflating the value to the
20             property to fraudulently justify a larger
              mortgage,' ... this allegation does not
21             constitute an exercise of dominion by Bank of
              America over plaintiff's property.
22
       Plaintiffs' allegations are no different from those in
23
*McKell*.  The cases upon which Plaintiffs rely are significantly
24
different from Plaintiffs' claimed conversion in this action.  As
25
noted, District Courts addressing similar allegations have ruled
26

24

that a conversion claim does not lie.  Plaintiffs have not stated a claim for conversion.  The motion to dismiss is GRANTED WITH LEAVE TO AMEND.

      D.   <u>FOURTH CAUSE OF ACTION FOR QUIET TITLE</u>.

      The Fourth Cause of Action is for quiet title.  Plaintiff alleges that they own the Subject Property and further allege:

> 96.  As described herein, Defendants have committed acts of misrepresentation and fraud with respect to the terms of Plaintiffs' loans and the value of the Subject Property, with the intent to exert undue influence.
>
> 97.  Defendants' acts subjected Plaintiffs to unfair persuasion amounting to undue influence because the parties had a relationship by which Plaintiffs were justified in assuming that Defendants would not act in a manner inconsistent with Plaintiffs' welfare and best interests.
>
> 98.  Defendants gained unfair persuasion over and undue influence of Plaintiffs by improper means, including but not limited to misrepresentation, undue flattery, and fraud.
>
> 99.  As a result of this unfair persuasion over and undue influence of Plaintiffs, Defendants received a Deed of Trust to the Subject Property for loans that Plaintiffs should not ever have been given or allowed to take.  Plaintiffs would not have received these loans but for Defendants' wrongful deceptive conduct.
>
> 100.  Defendants have all worked and colluded together, acting individually in their respective roles as lender, trustee, fiduciary agent, beneficiary, debt collector, and foreclosing agent in clouding Plaintiffs' title to the Subject Property.  Defendants now seek possession of the Subject Property via default and foreclosure.  In the process, they seek to cloud title and/or have already clouded Plaintiffs' title by acting on a wrongful security deed that is based on

wrongful loans, specifically by recording
notices of default and notices of sale on the
Subject Property's deed records, thus
creating wrongful title.

101.   Defendants' actions were intentional,
oppressive, and conducted with fraud or
malice, in conscious disregard of Plaintiffs'
consumer protection rights, justifying an
award of punitive damages ....

102.   Defendants' unfair persuasion over and
undue influence of Plaintiffs has caused
Plaintiffs to suffer severe financial
hardship and forced Plaintiffs to grant deeds
of trust to Defendants.   Plaintiffs request
that this Court invalidate the deeds of trust
on the Subject Property.

Defendants move to dismiss the Fourth Cause of Action on

several grounds.

Defendants argue that the Complaint does not allege facts

sufficient to demonstrate undue influence, citing California

Civil Code § 1575:

Undue influence consists:

1.   In the use, by one in whom a confidence
is reposed by another, or who holds a real or
apparent authority over him, of such
confidence or authority for the purpose of
obtaining an unfair advantage over him;

2.   In taking an unfair advantage of
another's weakness of mind; or,

3.   In taking a grossly oppressive and unfair
advantage of another's necessities or
distress.

Defendants contend that the Complaint does not allege that

Plaintiffs were of unsound mind or that they had "necessities or

distress" that Defendants to grossly oppressive and unfair

advantage.   With respect to the allegation that "the parties had

26

a relationship by which Plaintiffs were justified in assuming that Defendants would not act in a manner inconsistent with Plaintiffs' welfare and best interests," Defendants note that, under California law, no such special relationship exists between a bank and a borrower from a bank. *See Kim v. Sumitomo Bank*, 17 Cal.App.4th 974, 979-981 (1993); *Nymark v. Heart Fed. Savings & Loan Assn.,* 231 Cal.App.3d 1089, 1093 n.1 (1991); *Price v. Wells Fargo Bank*, 213 Cal.App.3d 465, 476 (1989).

Plaintiffs do not respond to this aspect of the motion to dismiss the Fourth Cause of Action and thereby concede that the Complaint does not allege facts from which undue influence within the meaning of Section 1575 may be inferred or that a special relationship existed between them and the Bank of America.

Defendants further argue that Plaintiffs cannot rescind their loans or the Deeds of Trust securing those loans without repaying the money they borrowed. *See* California Civil Code § 1691. Quiet title is an equitable claim, a plaintiff in equity must do equity in order to obtain relief. In these circumstances, this means repaying the money borrowed before voiding the security for the loan. *See* 4 Miller & Starr, Cal. Real Estate § 10:212, pp. 686-87 (3d ed. 2003). As explained in *Gaitan v. Mortgage Electronic Registration System,* 2009 WL 3244729 at *12 (C.D.Cal.2009):

> A basic requirement of an action to quiet title is an allegation that plaintiffs 'are the rightful owners of the property, *i.e.,* that they have satisfied their obligations under the Deed of Trust.' *Kelley v. Mortgage*

> *Elec. Reg. Sys., Inc. ...,* 2009 WL 2475703 at
> *7 (N.D.Cal., Aug.12, 2009).  '[A] mortgagor
> cannot quiet his title against the mortgagee
> without paying the debt secured.'  *Watson v.
> MTC Financial, Inc. ...,* 2009 WL 2151782
> (E.D.Cal., Jul. 17, 2009), quoting *Shimpones
> v. Stickney*, 219 Cal. 637, 649 (1934).

Plaintiffs respond:

> [I]t would be inequitable to require
> Plaintiffs to first tender amounts owed in
> order to quiet title in this instance since
> Plaintiffs' consent to the alleged security
> deed was procured by Defendants through fraud
> and violation of California's unfair
> Competition laws.  Thus, Plaintiff's tender
> obligations are excused.  In essence,
> Defendants are wrongfully attempting to
> prevent Plaintiffs from having their day in
> court by attempting to dismiss Plaintiffs'
> case on the basis that they have failed to
> tender amounts owed on a fraudulent loan.
> Moreover, such an argument is not the basis
> for dismissal but at a minimum requires a
> hearing on Plaintiffs' grounds for temporary
> injunctive relief and Defendants to prove
> which if any damage they may incur by the
> prevention of foreclosure during the
> resolution of the issues at hand.

Plaintiffs cite no authority for their position that their

tender obligation is excused and that Plaintiffs can keep both

the Subject Property and the loan amounts.  Plaintiffs' response

infers that they are unable to make the tender, i.e., they do not

have the present financial ability to make it.

Defendants' motion to dismiss the Fourth Cause of Action is

GRANTED WITH LEAVE TO AMEND.  Plaintiffs shall plead facts, if

they can, from which it may be ascertained, consistent with Rule

11, Federal Rules of Civil Procedure, that they were subjected to

undue influence or had a legally cognizable special relationship

with the Bank of America, and that they have the present ability to tender the loan payments.

    E.   <u>FIFTH CAUSE OF ACTION FOR DEFAMATION</u>.

    The Fifth Cause of Action for defamation, after incorporating all preceding allegations, alleges:

        104.  Defendants threatened to report and actually reported to credit agencies and other third parties that Plaintiffs were in default on their loans with respect to monthly payments that Defendants incorrectly assessed.

        105.  These reports were false, and Defendants made these statements with clear knowledge of their wrongful acts: that they issued Plaintiffs loans illegally: and that they incorrectly assessed Plaintiffs' monthly payments.

        106.  Despite this knowledge, Defendants made false statements to third parties concerning the amount Plaintiffs owed and did not pay. Defendants made these false statements in an attempt to defame Plaintiffs' reputations and lower their credit scores.

        107.  Defendants' purported right to report to credit bureaus as creditors does not bestow upon them a right to report to credit bureaus as creditors of wrongfully obtained debt upon which a borrower exercises its legal right not to pay.  Reporting to credit agencies late payment or nonpayment on a loan known to be fraudulent manifests a specific intent to defame, with malice against the borrower.

        108.  Defendants have also attempted to foreclose by recording a notice of default on the Subject Property's deed records, publicizing false and very damaging information about Plaintiffs in the process. Defendants conducted these acts with the specific intent to damage Plaintiffs, knowing their false statements would be exposed to the public, for not making monthly mortgage

payments that Plaintiffs believe in good
faith to be fraudulent.

Defendants move to dismiss the Fifth Cause of Action on the

ground that "the federal Fair Credit Reporting Act preempts state

law defamation claims arising from inaccurate reports to credit

reporting agencies, at least absent a pleading of facts showing

malice - i.e., publication with knowledge that the defamatory

credit report was false or with reckless disregard of whether it

was false or not."

15 U.S.C. § 1681h(e) provides:

Except as provided in sections 1681n and
1681o of this title, no consumer may bring
any action or proceeding in the nature of
defamation ... with respect to the reporting
of information against any ... person who
furnishes information to a consumer reporting
agency, based on information disclosed
pursuant to section 1681g, 1681h, or 1681m of
this title ..., except as to false
information furnished with malice or willful
intent to injure such consumer.

15 U.S.C. §§ 1681t(a) and (b)(1)(F) provide:

(a) Except as provided in subsection[](b) ...
of this section, this subchapter does not
annul, alter, affect, or exempt any person
subject to the provisions of this subchapter
from complying with the laws of any State
with respect to the collection, distribution,
or use of any information on consumers, or
for the prevention or mitigation of identity
theft, except to the extent that those laws
are inconsistent with any provision of this
subchapter, and then only to the extent of
the inconsistency.

(b) No requirement or prohibition may be
imposed under the laws of any State -

    (1) With respect to any subject
matter regulated under -

30

...

>               (F) SECTION 1681s-2 of
> this title, relating to the responsibilities
> of persons who furnish information to
> consumer reporting agencies, except that this
> paragraph shall not apply -

...

>               (ii) with respect to
> section 1785.25(a) of the California Civil
> Code (as in effect on September 30, 1996)
> ....

Defendants cite *Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1165-1168 (9th Cir.2009), *petition for cert. filed* March 15, 2010 (No. 09-1142).[2]  In *Gorman*, a cardholder instituted a lawsuit against his credit card issuer, alleging violations of the Fair Credit Reporting Act (FCRA), libel, and violations of California's credit reporting law.  The Ninth Circuit, addressing FCRA preemption, stated in *dicta*:

> Although § 1681t(b)(1)(F) appears to preempt
> all state law claims based on a creditor's
> responsibilities under § 1681s-2, § 1681h(e)
> suggests that defamation claims can proceed
> against creditors as long as the plaintiff
> alleges falsity and malice.  Attempting to
> reconcile the two sections has left district
> courts in disarray.  The district court in
> this case held that § 1681h(e), the more
> specific preemption provision, trumped the
> more general preemption provision of §
> 1681t(b)(1)(F) ... Other district courts have
> followed different approaches.  Some have
> concluded that the later-enacted §
> 1681t(b)(1)(F) effectively repeals the
> earlier preemption provision, § 1681h(e) ...
> Attempting to give meaning to both sections,

---

[2]Defendants cited *Gorman* as 552 F.3d 1008.  However, the opinion at that citation was amended and superseded by the opinion reported at 584 F.3d 1147.

other courts have observed that §
1681t(b)(1)(F) relates to 'any subject matter
regulated under section 1681s-2,' the section
which regulates the responses to furnishers
to notices of dispute.  Hence, these courts
apply a 'temporal approach,' holding that
'causes of action predicated on acts that
occurred *before* a furnisher of information
had notice of any inaccuracies are not
preempted by § 1681t(b)(1)(F), but are
instead governed by § 1681h(e).' ....

Gorman advocates a still different
'statutory' analysis, under which 't(b)(1)(F)
preempts only state law claims against credit
information furnishers brought under state
statutes, just as 1681h(e) preempts only
state tort claims.' ... Finally, MBNA argues
that § 1681h(e) is not a broad preemption
provision at all, but simply a 'grant of
protection for statutorily required
disclosures.' ... But, of course, granting
entities immunity from state law tort suits
is just another way of saying that certain
state law claims are preempted.

In the end, we need not decide this issue.
As we conclude below, even if Gorman could
bring a state law libel claim under §
1681h(e), and such a claim were not preempted
by § 1681t(b)(1)(F), he has not introduced
sufficient evidence to survive summary
judgment on this claim.

*Id.* at 1166-1167.  The Ninth Circuit further ruled:

The FCRA does not define the appropriate
standard for 'malice.'  The two circuits that
have interpreted § 1681h(e) have applied the
standard enunciated in *New York Times v.
Sullivan*, 376 U.S. 254, 279-80 ... (1964),
requiring the publication be made 'with
knowledge that it was false or with reckless
disregard of whether it was false or not.'
... Under *New York Times*, to show 'reckless
disregard,' a plaintiff must put forth
'sufficient evidence to permit the conclusion
that the defendant in fact entertained
serious doubts as to the truth of his
publication.' ... We agree with the courts
that have adopted the *New York Times* standard

32

for purposes of § 1681h(e) and so apply it
here.

*Id.* at 1168.

Plaintiffs, relying on Section 1681t(a) and *Sanai v. Saltz*,
170 Cal.App.4th 746 (2009), argues that there is no implied or
field preemption under the FCRA.

In *Sanai*, the Court of Appeals held that the trial court
erred in granting a motion for judgment on the pleadings as to
plaintiff's cause of action for violation of the California
Consumer Reporting Agencies Act, California Civil Code § 1785.1,
*et seq.*, but properly granted the motion as to the state common
law causes of action for slander, libel, intentional and
negligent interference with prospective economic advantage, and
intentional and negligent infliction of emotional distress.
Because Plaintiffs have not alleged a violation of Section
1785.1, *Sanai* is of no assistance to Plaintiffs.   Nonetheless,
the law concerning preemption by the FCRA of Plaintiffs'
defamation claim is too unsettled to resolve at this stage of the
proceedings.   Defendants' motion to dismiss on this ground is
DENIED WITHOUT PREJUDICE.

Defendants further argue that, even if the Fifth Cause of
Action is not preempted by the FCRA, Plaintiffs have not stated a
claim upon which relief can be granted:

> The defamation claim is based on their
> contention that the loans were issued
> illegally ... As explained above, there is no
> <u>factual</u> allegation of illegality or other
> wrongful conduct in the origination of these
> loans.

1          Plaintiffs are now faced with monthly
           payments that they cannot afford, and are
2          unable to refinance the Subject Property.

3     In *Montoya v. Countrywide Bank, supra*, 2009 WL 1813973 at

4  *10-11, the Northern District held:

5          Defendants move to dismiss Plaintiffs'
           defamation claim on the ground that reporting
6          a true statement to a credit agency is not
           defamation ....
7
           Defamation is 'the intentional publication of
8          a statement of fact which is false,
           unprivileged, and has a natural tendency to
9          injury or which causes special damage.' ... A
           credit report, even one that causes harm, is
10         not defamatory if it is true ... A
           plaintiff's admission of truth will bar a
11         claim for defamation ....

12         Here, Plaintiffs allege that they 'are no
           longer able to make the required payments' on
13         their loans ... Plaintiffs also allege that:

14             [i]n an attempt to coerce payments
               out of the Plaintiffs in regards to
15             the fraudulently obtained
               [residential mortgage loans], the
16             Defendant Countrywide threatened
               and actually reported to credit
17             agencies and other third parties
               that Plaintiffs were in default on
18             the [residential mortgage loan] for
               a payment that was incorrectly
19             assessed.

20             ...

21             Defendants ... conspired to make
               these statements with full
22             knowledge of Defendants' wrongful
               and fraudulent conduct and the
23             Defendants were full [sic] aware
               that the [residential mortgage
24             loan] was obtained illicitly.

25         Based on these allegations, Plaintiffs'
           defamation claim is premised on Defendants'
26         statements to credit agencies that Plaintiffs

34

1
2
3
4
5

    were in default on their loan despite knowing
    the loan was obtained illicitly.  However, as
    the Complaint also alleges, Plaintiffs were
    unable to pay their mortgage, and therefore,
    regardless of how the loan was obtained,
    Defendants' reports to credit agencies, as
    alleged, are true.  Thus, the Court finds
    Plaintiffs have failed to allege a
    publication of a false statement.

*See also Fortaleza v. PNC Financial Services Group, Inc.*, 642

F.Supp.2d 1012, 1026 (N.D.Cal.2009)("Critically, however,

plaintiff does not allege, and has not contested, the

truthfulness of the fact of plaintiff's default on the subject

loans ... Thus, plaintiff cannot demonstrate the requisite

'falsity' of any alleged statements by defendants.").  Here, the

Complaint alleges "Plaintiffs are now faced with monthly payments

that they cannot afford, and are unable to refinance the Subject

Property."  This allegation implies that Plaintiffs are in

default on the loan, thereby making the reports to the credits

agencies true.  This pleads the Plaintiffs out of a defamation

claim.

   Defendants' motion to dismiss the Fifth Cause of Action on

this ground is GRANTED WITH LEAVE TO AMEND.

   F. <u>SIXTH CAUSE OF ACTION FOR VIOLATIONS OF CALIFORNIA</u>

<u>BUSINESS AND PROFESSIONS CODE</u>.

   The Sixth Cause of Action, after incorporating all preceding

allegations, alleges:

    112.  As described herein, Defendants, via
    deceptive and misleading advertising and
    sales practices, misrepresentations,
    deceptive conduct, and the withholding of
    information, unfairly, unlawfully, and

fraudulently induced Plaintiffs into purchasing the mortgage loans here at issue, to Plaintiffs' great detriment and Defendants' wrongful profit.

113.  Defendants' fraudulent acts, business model, and illusory underwriting standards were designed to perpetuate a scheme of unfair business practices, in violation of California Business and Professions Code §§ 17200 *et seq.*, through which Defendants wrongfully profited.  The components of this scheme as applied to Plaintiffs included, but were not limited to, artificially inflating the Subject Property's value in order to increase the loan amount and misleading Plaintiffs through the use of a Hybrid ARM that provided an initial 'teaser' interest rate and interest only payments coupled with a piggyback balloon loan.  Defendants' intended for their misrepresentations to unfairly prejudice Plaintiffs in order that Defendants would profit from Plaintiffs' loss.

114.  When issuing this loan package, Defendants disregarded Plaintiffs' ability to repay the loans and failed to disclose the true cost of the loans, as required by law.

115.  Defendants have violated and continue to violate California Business and Professions Code §§ 17200 *et seq.* by making untrue or misleading statements, or by causing untrue or misleading statements to be made to Plaintiffs, with the intent of inducing Plaintiffs to enter into the risky loans that are the subject of this Complaint. These untrue or misleading statements include but are not limited to:

     a.  statements regarding the true terms and payment obligations pertaining to the loans, including statements obfuscating the risks of Plaintiffs' loan package;

     b.  statements as to the Subject Property's value at the time of origination, when the stated value was in fact inflated, and to the

36

effect that said property value
would continue to rise and enable
Plaintiffs to refinance; and

c.   statements indicating that
Defendants did not render any
illegal kickbacks, fees, or other
things of value.

116.   Defendants knew, or by the exercise of
reasonable care should have known that these
statements or omissions were untrue or
misleading at the time they were made.

117.   Defendants' unfair business practices
have caused Plaintiffs to suffer severe
financial hardship resulting in damages in an
amount to be proven at trial.

"The UCL is codified in Business and Professions Code
section 17200 *et seq.*   The UCL prohibits any 'unlawful, unfair or
fraudulent business act or practice.'   Because Business and
Professions Code section 17200 is written in the disjunctive, it
establishes three varieties of unfair competition – acts or
practices which are unlawful, or unfair, or fraudulent ... An act
can be alleged to violate any or all of the three prongs of the
UCLA – unlawful, unfair, or fraudulent."   *Berryman v. Merit
Property Management*, 152 Cal.App.4th 1544, 1554 (2007), citing
*Podolsky v. First Healthcare Corp.*, 50 Cal.App.4th 632, 647
(1996).

Defendants move to dismiss the Sixth Cause of Action to the
extent it alleges that Defendants' practices were "unlawful."   As
explained in *Berryman, supra*:

Under its 'unlawful' prong, 'the UCL borrows
violations of other laws ... and makes those
unlawful practices actionable under the UCL.'
... Thus, a violation of another law is a

37

predicate for stating a cause of action under the UCL's unlawful prong.

Here, the Complaint does not specifically allege a violation of another law.  Defendants motion to dismiss is GRANTED WITH LEAVE TO AMEND to the extent the Sixth Cause of Action alleges that Defendants' acts were "unlawful" within the meaning of the UCL.

As to the unfairness prong, as explained in *Schnall v. Hertz Corp.*, 78 Cal.App.4th 1144, 1166-1167 (2000):

'The independent "unfairness" prong of the UC[L] 'intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud ...' ... It has been said that a business practice may be 'unfair' within the meaning of the UCL even if it is not 'unlawful'; it is enough if the conduct in question '"'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' ..."' ... However, in *Cel-Tech*, our Supreme Court recently found that this formulation of unfairness is 'too amorphous' and disapproved its use, at least with respect to claims of unfair competition between two direct competitors. (*Cel-Tech*, *supra*, 20 Cal.4th at pp. 184-185.)  The *Cel-Tech* court required 'that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition.'  (*Id.* at pp. 186-187.)[FN 14]

[FN 14] The *Cel-Tech* court adopted the following test: 'When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'  (*Cel-Tech, supra*, 20 Cal.4th

38

1    at p.187.).

2    Plaintiff citing *Scripps Clinic v. Superior Court*, 108

3    Cal.App. 4th 917, 939 (2003), asserts that "unfair" conduct is

4    conduct that "offends an established public policy or ... is

5    immoral, unethical, oppressive, unscrupulous or substantially

6    injurious to consumers."

7    There is a conflict among the California Courts of Appeal

8    whether the *Cel-Tech* standard of "unfairness" applies to

9    consumer cases. *See, e.g., Gregory v. Albertson's, Inc.*, 104

10   Cal.App.4th 845, 854 (2002)(reading *Cel-Tech* 'to require that the

11   public policy which is a predicate to the action must be

12   "tethered" to specific constitutional, statutory or regulatory

13   provisions' in consumer cases'); *Smith v. State Farm Mut. Auto.*

14   *Ins., Co.*, 93 Cal.App.4th 700, 720 n.23 (2001)('[W]e are not to

15   read *Cel-Tech* as suggesting that such a restrictive definition of

16   "unfair" should be applied in the case of an alleged *consumer*

17   injury[.]'); *see also Kilgore v. Keybank*, 2010 WL 1461577 at *8

18   (N.D.Cal., April 12, 2010); *Davis v. Ford Motor Credit Co.*, 179

19   Cal.App.4th 581, 594-597 (2009).

20   "A fraudulent business practice is one in which '"'members

21   of the public are likely to be "deceived."'"'" *Morgan v. AT & T*

22   *Wireless Services, Inc.*, 177 Cal.App.4th 1235, 1254 (2009). As

23   explained in *In re Tobacco II Cases*, 46 Cal.4th 298, 312 (2009):

24       The fraudulent business practice prong of the
         UCL has been understood to be distinct from
25       common law fraud. 'A [common law] fraudulent
         deception must be actually false, known to be
26       false by the perpetrator and reasonably

39

> relied upon by a victim who incurs damages.
> None of these elements are required to state
> a claim for injunctive relief' under the UCL
> ... This distinction reflects the UCL's focus
> on the defendant's conduct, rather than the
> plaintiff's damages, in service of the
> statute's larger purpose of protecting the
> general public against unscrupulous business
> practices.

Plaintiffs cite and quote *In re Tobacco Cases II* but delete by ellipsis "injunctive" and imply that this standard applies to all claims for fraudulent business practices under the UCL. However, as stated in *In re Tobacco II Cases,* "'[a] UCL action is equitable in nature; damages cannot be recovered ... We have stated under the UCL, "[p]revailing plaintiffs are generally limited to injunctive relief and restitution." ....'" 46 Cal.4th at 312. *See also Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1144 (2003):

> While the scope of conduct covered by the UCL
> is broad, its remedies are limited ... A UCL
> action is equitable in nature; damages cannot
> be recovered ... We have stated that under
> the UCL, '[p]revailing plaintiffs are
> generally limited to injunctive relief and
> restitution.'

Defendants cite *Rangel v. DHI Mortg. Co., Ltd.*, 2009 WL 2190210 at *4 (E.D.Cal., July 21, 2009), where Judge O'Neill, in dismissing a claim for negligence, alleging that defendants breached their "professional services" duty in that "plaintiff was placed into a loan that were [sic] inappropriate for her personal financial circumstances," ruled:

> DHI Mortgage correctly notes the absence of
> an actionable duty between a lender and
> borrower in that loan transactions are arms-

length and do not invoke fiduciary duties.
Absent 'special circumstances' a loan
transaction 'is at arms-length and there is
no fiduciary relationship between the
borrower and lender.' ... Moreover, a lender
'owes no duty of care to the [borrowers] in
approving their loan.  Liability to a
borrower for negligence arises only when the
lender "actively participates" in the
financed enterprise "beyond the domain of the
usual money lender."' ... '[A]s a general
rule, a financial institution owes no duty of
care to a borrower when the institution's
involvement in the loan transaction does not
exceed the scope of its conventional role as
a mere lender of money.' ...

DHI Mortgage further notes the absence of a
lender's duty to ensure a loan is suitable
for a borrower.  'No such duty exists' for a
lender 'to determine the borrower's ability
to repay the loan ... The lender's efforts to
determine the creditworthiness and ability to
repay by a borrower are for the lender's
protection, not the borrower's.'  *Renteria v.
United States*, 452 F.Supp.2d 910, 922-923
(D.Ariz.2006)(borrowers 'had to rely on their
own judgment and risk assessment to determine
whether or not to accept the loan').

*See also Abelyan v. OneWest Bank*, 2009 WL 3784610 at *4

(C.D.Cal., Nov. 9, 2009):

To establish a claim under the 'fraudulent'
prong of the UCL, a plaintiff must
demonstrate that 'members of the public are
likely to be deceived.'  *Williams v. Gerber
Products Co.,* 523 F.3d 934, 938 (9th
Cir.2008).  The gravamen of plaintiff's claim
is that defendant fraudulently failed to
disclose all the terms of her loan.  However,
'absent a duty to disclose, the failure to do
so does not support a claim under the
fraudulent prong of the UCL.'  *Buller v.
Sutter Health, et al.,* 160 Cal.App.4th 981,
987 (2008).  In her complaint, plaintiff does
not specifically allege any required duty to
disclose on the part of defendant.
Accordingly, the Court concludes that
dismissal of plaintiff's UCL claim is

41

1    appropriate.

2        Defendants also cite *Nymark v. Heart Federal Savings & Loan*

3    *Assn., supra*, 231 Cal.App.3d at 1095-1096, 1099-1100.  In *Nymark*,

4    a property owner brought an action against a lending institution

5    alleging negligence in the institution's appraisal of the

6    property uses as security for a loan.  The institution appraised

7    the property and approved the loan, finding the property was in

8    good condition.  The owner subsequently discovered the property

9    needed costly repairs.  The Court of Appeals held:

10           The parties have not identified, nor have we
             found, any California case specifically
11           addressing whether a lender has a duty of
             care to a borrower in appraising the
12           borrower's collateral to determine if it is
             adequate security for a loan.  However, as a
13           general rule, a financial institution owes no
             duty of care to a borrower when the
14           institution's involvement in the loan
             transaction does not exceed the scope of its
15           conventional role as a mere lender of money
             ....
16
             Here, defendant performed the appraisal of
17           plaintiff's property in the usual course and
             scope of its loan processing procedures to
18           protect *defendant's* interest by satisfying it
             that the property provided adequate security
19           for the loan.  The complaint does not allege,
             nor does anything in the summary judgment
20           papers indicate, that the appraisal was
             intended to induce plaintiff to enter into
21           the loan transaction or to assure him that
             his collateral was sound.  Accordingly, in
22           preparing the appraisal, defendant was acting
             in its conventional role as a lender of money
23           to ascertain the sufficiency of the
             collateral as security for the loan.  'Normal
24           supervision of the enterprise by the lender
             for the protection of its security interest
25           in loan collateral is not "active
             participation" [in the financed enterprise
26           beyond that of the ordinary role of a lender

                                42

in a loan transaction.' ... Thus, we conclude
that defendant owed no duty of care to
plaintiff in the preparation of the property
appraisal.

...

... In California, the test for determining
whether a financial institution owes a duty
of care to a borrower-client 'involves the
balancing of various factors, among which are
[1] the extent to which the transaction was
intended to affect the plaintiff, [2] the
foreseeability of harm to him, [3] the degree
of certainty that the plaintiff suffered
injury, [4] the closeness of the connection
between the defendant's conduct and the
injury suffered, [5] the moral blame attached
to the defendant's conduct, and [6] the
policy of preventing future harm.' ....

...

While it was foreseeable the appraisal might
be considered by plaintiff in completing the
loan transaction, the foreseeability of harm
was remote.  Plaintiff was in as good a
position as, if not better position than,
defendant to know the value and condition of
the property.  One who seeks financing to
purchase real property has many means
available to assess the property's value and
condition, including comparable sales, advice
from a realtor, independent appraisal,
contractors' inspections, personal
observation and opinion, and the like.  Here,
plaintiff already had purchased the house and
had lived in it for two years, apparently
without complaint, before applying to
defendant for a refinancing loan.  We believe
it is not reasonably foreseeable that a
borrower will be influenced to his or her
detriment by an appraisal prepared by the
lender for its own benefit because the
borrower is in a position in which he or she
knows or should know the value and condition
of the property independent of the appraisal
made for the lender's protection.  Stated
another way, the borrower should be expected
to know that the appraisal is intended for
the lender's benefit to assist it in

43

1          determining whether to make the loan, and not
           for the purpose of ensuring that the borrower
2          has made a good bargain, i.e., not to insure
           the success of the investment.
3
        Plaintiffs argue that they have stated a claim upon which
4
relief can be granted:
5
           Plaintiffs sufficiently allege how Defendants
6          conducted fraudulent business practices
           likely to mislead and deceive the consumer,
7          including Plaintiffs, with their teaser
           interest rates, inflation of property value,
8          misrepresentation as to affordability,
           misrepresentations as to true risk factors
9          and costs of loans, unscrupulous
           incentivizing of brokers and agents to
10         aggressively and deceptively market, and
           concealment of Defendants' system of transfer
11         and securitization of the Plaintiffs' loans
           which offset BOA's liability and inflated
12         Defendants' profitability while burdening
           Plaintiff [sic] with undue cost and risk.
13         BOA is the originator and servicer of the
           loans, and PRLAP is the trustee per deed of
14         trust.  As the originator, BOA has full
           knowledge of the loan terms that these terms
15         were inappropriate for the Subject Property
           and Plaintiffs' actual financial
16         qualifications when BOA approved, closed, and
           serviced the loan [sic].  BOA also had full
17         knowledge of how misleading, deceptive, and
           unduly risky the loans were for Plaintiffs.
18         However, rather than warn Plaintiffs, BOA
           steered Plaintiffs into a Hybrid ARM loan
19         originated from the stated income program
           because these loans were highly profitable,
20         thereby perpetuating the misrepresentation
           that Plaintiffs were qualified for the loan.
21         Most importantly, BOA and PRLAP had full
           knowledge of the profitability of the
22         secondary securities market where the margin
           of profit was driven by indiscriminate volume
23         and risky loans.  This margin of profit was
           Defendants' only consideration when selling
24         Plaintiff's loan [sic].

25      Defendants' motion to dismiss the Sixth Cause of Action is

26 GRANTED WITH LEAVE TO AMEND as to the "unfair" and "fraudulent"

                                   44

1   prongs of the UCL.  Plaintiffs shall plead specific facts from

2   which it may be inferred that Defendants owed a legal duty to

3   Plaintiffs.

4        G.   <u>SEVENTH CAUSE OF ACTION FOR CIVIL CONSPIRACY</u>.

5        After incorporating all preceding allegations, the Seventh

6   Cause of Action alleges:

7            119.  Defendants acted in concert and
             partnership with one another to commit the
8            wrongful acts alleged in this Complaint.
             Defendants created this multi-party system
9            and scheme in order to facilitate and
             perpetuate their unlawful profiteering
10           through subprime residential home mortgage
             lending, on a national scale.  Plaintiffs are
11           merely two of many injured as a consequence
             of Defendants' systemized conduct.
12
             120.  Defendants knowingly participated in a
13           conspiracy to violate laws protecting
             consumers, including Plaintiffs, from fraud
14           and unfair competition.  Specifically, this
             conspiracy related to the processing of loan
15           applications in a manner that each defendant
             knew or should have known was malicious,
16           wrongful, and unlawful.  Defendants
             intentionally created and perpetuated risky
17           loan products, including the loan package at
             issue in this action, and aggressively
18           marketed their risky loan products to
             consumers.  In their interactions with
19           Plaintiffs concerning these risky loan
             products, Defendants, and each of Defendants,
20           purposely concealed or failed to disclose
             their risky and dangerous nature, including
21           the risks inherent in a Hybrid ARM that
             provided an initial 'teaser' interest rate
22           and interest-only payments, coupled with a
             piggyback balloon loan, to Plaintiffs'
23           detriment.

24           121.  All Defendants turned a blind eye to
             this known fraud and to the risks inherent in
25           the loans BoA originated because they all
             profited, and even now continue to profit off
26           of such loans, despite their astronomical

                               45

default and foreclosure rates.

122.  Defendants' business relationships allowed Defendants to perpetuate and to expand this conspiracy, as they provided for one another the right to service, assign, sell, or otherwise transfer for a profit, which each defendant did, in turn, acquire.

123.  Defendants' conspiracy included their collective efforts to profit through the securitization process, which was beneficial to all of Defendants because it both generated massive capital and allowed Defendants to shed credit risk from the likely failure of the underlying mortgage loans, including Plaintiffs'.  Defendants often securitized their risky loan products themselves, that is they sold, purchased, aggregated, and issued securities based on the loans themselves.  Defendants had strong incentives to securitize the loans quickly, and in fact the same corporate executives often signed off on securitization contracts as both the originator and purchaser of the same underlying mortgage loan.

124.  Defendants' scheme was to profit through the securitization of their loans fed their motivation to commit the unlawful acts described herein.  For example, in order for an asset-backed security to ostensibly satisfy Securities and Exchange Commission regulations, such a security may not contain non-performing loans and delinquent loans may not constitute 50% or more of the asset's pool on the date that pool is readied for sale.  Because their risky loan products ultimately default at a rate exceeding 50%, Defendants needed to perpetually originate more and more of such risky loans, including the loan package here at issue, in order to give a false impression of a lower delinquency rate.

Defendants move to dismiss the Seventh Cause of Action on the ground that civil conspiracy is not a cause of action, citing *Applied Equipment Corp. v. Litton Saudi Arabia Ltd*, 7 Cal.4th

503, 510-511 (1994):

> Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration ... By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other conspirators within the ambit of the conspiracy ... In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors.

> Standing alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort. '"A civil conspiracy, however atrocious, does not per se give rise to a cause of action unless a civil wrong has been committed resulting in damage."'

Defendants assert that "[a]s the complaint does not otherwise allege a viable claim, these appendages have no body on which to hang, and so must be dismissed along with the rest of the complaint."

Because Defendants' motion to dismiss is granted with leave to amend, the motion to dismiss the Seventh Cause of Action is GRANTED WITH LEAVE TO AMEND. As to allegations of conspiracy, heightened pleading is required by Rule 9(b) when the object of the conspiracy is fraudulent. *See Wasco Products v. Southwell Technologies,* 435 F.3d 989, 991 (9th Cir.), *cert. denied*, 549 U.S. 817 (2006)("Based on these precedents and the plain language of Rule 9(b), we hold that under federal law a plaintiff must plead, at a minimum, the basic elements of a civil conspiracy if the object of the conspiracy is fraudulent."). As explained in

*Alfus v. Pyramid Technology Corp.*, 745 F.Supp. 1511, 1521

**(N.D.Cal.1990):**

> To survive a motion to dismiss, plaintiff
> must allege with sufficient factual
> particularity that defendants reached some
> explicit or tacit understanding or agreement
> ... It is not enough to show that defendants
> might have had a common goal unless there is
> a factually specific allegation that they
> directed themselves towards the wrongful goal
> by virtue of a mutual understanding or
> agreement.

**Plaintiffs have not satisfied the requirements of Rule 9(b) with**

**regard to the Seventh Cause of Action.  Defendants' motion to**

**dismiss the Seventh Cause of Action is GRANTED WITH LEAVE TO**

**AMEND.**

**CONCLUSION**

**For the reasons stated:**

**1. Defendants' motion to dismiss is DENIED IN PART AND**

**GRANTED IN PART WITH LEAVE TO AMEND as described above;**

**2.  Counsel for Defendants shall prepare and lodge a form of**

**order consistent with this Memorandum Decision within five (5)**

**court days following service of this Memorandum Decision**

**2.  Plaintiffs shall file a First Amended Complaint in**

**accordance with the rulings herein within thirty (30) days of the**

**filing date of the Order.**

IT IS SO ORDERED.

**Dated:   May 5, 2010                              /s/ Oliver W. Wanger**
                                     UNITED STATES DISTRICT JUDGE